**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Civil Action No. 06-0842 (JGP) |
| : | |
| UNITED STATES SECRET SERVICE, : | |
| : | |
| Defendant. : | |
| : | |
| | |
| CITIZENS FOR RESPONSIBILITY AND : | |
| ETHICS IN WASHINGTON, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Civil Action No. 06-0883 (JGP) |
| : | |
| U.S. DEPARTMENT OF HOMELAND : | |
| SECURITY, : | |
| : | |
| Defendant. : | |
| : | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION**
**TO DISMISS PLAINTIFF'S FOIA CLAIMS AND REQUEST FOR DISCOVERY**

**STATEMENT**

Defendant U.S. Department of Homeland Security's ("DHS")[1] latest motion to dismiss

the Freedom of Information Act ("FOIA") claims of plaintiff Citizens for Responsibility and

Ethics in Washington ("CREW") demonstrates a complete lack of respect for the processes of

---

[1] While DHS is the named defendant, CREW sought records under the FOIA from the
United States Secret Service ("Secret Service"), a component of DHS.  DHS and Secret Service
are used interchangeably in this brief.

this Court and makes clear that DHS is interested in one thing and one thing only – avoiding at

all costs any scrutiny by the Court, CREW or the public of its record keeping practices.  Indeed,

DHS's motion, brought under the guise of Rule 12(b)(1) of the Federal Rules of Civil Procedure,

is so factually and legally flawed as to raise a question of whether it has been made in bad faith

for an improper purpose.[2]

Until this motion, DHS has sounded a loud and consistent theme – the records that

CREW and the DNC have requested under the FOIA are not agency records and, therefore, their

disclosure cannot be compelled under the FOIA.  So, for example, when DHS moved to

consolidate CREW's complaint with that of the DNC, it based its motion in large part on its

claim that the two cases raised a common issue – whether the records the plaintiffs are seeking

are agency records under the FOIA.  And more recently, in response to the Court's Order of

August 9, 2006, in which the Court required DHS to describe the documents it possesses and

explain the basis for its position that they are not agency records, DHS repeated its mantra that

the records in question are not agency records.  In addition,  DHS argued that, if the requested

documents are agency records, portions are exempt under FOIA Exemptions 2, 5, 6 and 7.

Based on these representations and the failure of CREW and the DHS to reach a settlement of

CREW's FOIA claims, the parties established a briefing schedule.

Rather than brief the merits of its oft-repeated defense, however, DHS now argues that

the case is moot because the Secret Service conducted a reasonable search and released all non-

---

[2] In addition to inherent power, the Court possesses statutory power to address, through appropriate sanctions, conduct that "multiplies the proceedings in any case unreasonably and vexatiously."  28 U.S.C.§1927.  At this stage, CREW does not request the imposition of sanctions; however, we note that due to the recklessness of the conduct of defendant in these proceedings, the imposition of sanctions would not constitute error.

exempt documents.  This claimed release occurred with no notice to CREW, although the White

House apparently took great pains to provide selected journalists with advance copies of at least

some of the records along with a background briefing.  Even more troubling, CREW has yet to

receive from DHS any of the documents DHS claims in its motion to dismiss and in the

accompanying declaration, under penalty of perjury, to have provided CREW.

Apart from the circumstances under which DHS filed this motion, the motion itself is

premised on material factual representations that are very much in dispute and legal claims for

which DHS has not even come close to carrying its burden of proof.  For example, far from

documenting a reasonable search, the most recent Declaration of Kathy J. Lyerly raises serious

questions about whether the Secret Service has, in fact, looked in all searchable databases for

responsive documents, the extent to which the Secret Service successfully destroyed responsive

records, and the degree of control that the White House actually exercises over the Secret

Service and its records.

As discussed more fully below, the mounting evidence suggests that from the outset DHS

has been manipulating the parties and this Court in an apparent effort to avoid scrutiny and full

revelation of just what DHS has done and why.  From its initial and unilateral effort to get this

case into the Court's ADR process and thereby throw a blanket of secrecy over this matter, to its

invocation of Rule 12(b)(1) supported by a declaration that raises more questions than it

answers, DHS's conduct has raised serious questions that cannot be answered on the current

record.   The relevant information needed to respond fully to defendant's motion is within the

possession, custody, or control of defendant and the United States Government.  CREW seeks

limited discovery to obtain factual information that is necessary to address fully the arguments

raised by defendants in their motion to dismiss plaintiff's FOIA claims.[3]

## BACKGROUND

On February 2, 2006, CREW sent a FOIA request to DHS seeking records, regardless of form and specifically including electronic records and information, that related to visits by eight named individuals to the White House or the residence of the Vice President. Complaint, ¶24.[4] CREW also requested that DHS expedite its handling of the request and sought a waiver of fees associated with processing the request. Id. at ¶25. With the exception of records pertaining to Jack Abramoff, DHS has yet to produce to CREW any records pertaining to the other seven individuals named in CREW's request. Declaration of Sharon Y. Eubanks, ¶6 (Exhibit 1).[5]

The Democratic National Committee, plaintiff in this consolidated case, settled its claims against the Secret Service and filed a stipulation of dismissal on September 21, 2006. The terms of the settlement agreement are not set forth separately in the record.

## ARGUMENT

**I. DHS HAS NOT MET THE STANDARDS FOR A MOTION TO DISMISS UNDER RULE 12(b)(1) OF THE FEDERAL RULES OF CIVIL PROCEDURE**.

**A. Standards Under Rule 12(b)(1)**

---

[3]At this time, CREW does not seek discovery relevant to Claim Four of its complaint, the Federal Records Act Claim. That claim is the subject of a motion to dismiss.

[4] The eight individuals are Jack Abramoff, Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vassell, Kevin Ring, Edwin Buckham, and Patrick Pizzella. Id.

[5] Although CREW has yet to receive any additional documents from the defendant, it has received from an outside source a compact disk containing visitor records for these and other individuals, which it has since posted on its web site, as well as paper copies of certain records from the DNC. CREW, however, has no way to confirm whether these documents are the same documents that DHS attests it released to CREW, nor does it have any way to verify precisely what redactions DHS has made and on what basis.

In considering a motion to dismiss under Rule 12(b)(1), the Court is entitled to look at

material outside of the four corners of the complaint.  *See, e.g.*, Coalition for Underground

Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003) (under 12(b)(1) court may "consider

the complaint supplemented by undisputed facts evidenced in the record, or the complaint

supplemented by undisputed facts plus the court's resolution of disputed facts.").  When the

motion is based on a claim of mootness arising from "developments subsequent to the filing of

the complaint . . . the motion raises a factual challenge to the Court's subject matter jurisdiction."

Flores v. District of Columbia, 437 F.Supp. 2d 22, 29 (D.D.C. 2006).  In such instances,

particularly when the Court is asked to consider matters outside the pleadings, the plaintiff must

be afforded a "'reasonable opportunity' to present relevant material."  Gordon v. Nat'l Youth

Work Alliance, 675 F.2d 356, 361 (D.C. Cir. 1982).

Here, DHS argues that because of circumstances that post-date the filing of the complaint

the Court no longer has jurisdiction over CREW's FOIA claims.[6]  Specifically, DHS claims that

it has conducted a reasonable search and released to CREW all responsive non-exempt

documents.  From this DHS argues that the case is now moot and therefore subject to dismissal

under Rule 12(b)(1).

Under the terms of its motion, DHS can only prevail if it can establish on the current

---

[6]Defendant's mootness claim is premised upon its assertion that all records responsive to
CREW's request have been released by defendant, and as such, there is no case or controversy
presented.  As we establish in the declaration of Sharon Y. Eubanks, CREW did not receive the
documents referenced in defendant's brief and Ms. Lyerly's declaration.  Moreover, even if DHS
were to produce the records described in its motion and declaration, such a production would not
serve to render the FOIA claims moot.  There would remain significant and material factual gaps
regarding the production that must be filled before a mootness issue would be ripe for
adjudication by this Court.

record as a matter of uncontested fact and law:  (1) that it conducted a reasonable search; (2) that

all claimed exemptions comply with the FOIA; and (3) that DHS has actually disclosed

documents to CREW.  As discussed below, DHS cannot satisfy any of these requirements and, as

a necessary corollary, its motion must be denied.

### B.  DHS Has Yet To Produce Responsive Documents To CREW

Notwithstanding the representations of Kathy J. Lyerly, that "[o]n September 20, 2006,

all documents responsive to CREW's February 2, 2006 FOIA request with the redactions noted

were produced to CREW,"[7] CREW has yet to receive a single document from this claimed

release.  Eubanks Declaration ¶6.  Simply stated, CREW's FOIA claims cannot be dismissed as

moot unless and until, at a minimum, the agency makes a full disclosure of all responsive

documents.  That has yet to happen.[8]

### C.  DHS Has Not Established As A Matter Of Uncontested Fact That It Conducted A Reasonable Search.

Upon receipt of a properly submitted FOIA request, an agency must conduct a search that

is "reasonably calculated to uncover all relevant documents."  Weisberg v. U.S. Dep't of Justice,

---

[7] Declaration of Kathy J. Lyerly, Special Agent in Charge, Liaison Division and Freedom of Information and Privacy Acts Officer, United States Secret Service ("Lyerly Decl."), ¶32.

[8] Without these records neither CREW nor this Court has any ability to assess the adequacy of DHS's search.  CREW's preliminary review of the records provided to the DNC (which do not appear to be a complete duplicate of what the White House provided to the media, as currently available through CREW's web site, www.citizensforethics.org) raises some questions about the completeness of the disclosures.  For example, the records provided to the DNC and the media for Grover Norquist show almost weekly visits in 2001.  By contrast, Mr. Norquist's post-October 2004 visits – the period for which the Secret Service claims to have complete records – total only four.  There is a similar precipitous decline in the visits of Ralph Reed pre- and post-October 2004, raising questions about just how thorough a search the Secret Service conducted.

705 F.2d 1344, 1351 (D.C. Cir. 1983); *see also* Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C.

Cir. 1990). The reasonableness of an agency's search depends, in part, on the scope of the FOIA

request and the requester's description of the records sought. *See, e.g.*, 5 U.S.C. §552(a)(3)(A)

(requiring that a FOIA request "reasonably describe[]" the records sought). Moreover, as the

Department of Justice's Office of Information and Privacy has counseled government agencies,

FOIA requests should be interpreted "'liberally' when determining which records are

responsive." FOIA Update, Vol. XVI, No. 2 at 3, *quoting* Nation Magazine v. U.S. Customs

Serv., 71 F.3d 885, 890 (D.C. Cir. 1995).

The responding agency bears the burden of proving the adequacy of its search. *See, e.g.*,

Patterson v. IRS, 56 F.3d 832, 840 (7th Cir. 1995); Maynard v. CIA, 986 F.2d 547, 560 (1st Cir.

1993). The agency carries this burden through the submission of "detailed, nonconclusory

affidavits." Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476 (D.C. Cir. 1984); *see also* Oglesby

v. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990). Toward that end, agency declarations

will be deemed inadequate if they do not identify what files were searched, what search terms

were used, and do not show that the search method was "reasonably calculated to uncover all

relevant documents." Id. It is also necessary that the agency declaration "aver[] that all files

likely to contain responsive materials . . . were searched" in order to "afford a FOIA requester an

opportunity to challenge the adequacy of the search and to allow the district court to determine if

the search was adequate in order to grant summary judgment." Id. *See also* Iturralde v.

Comptroller of Currency, 315 F.3d 311, 313-14 (D.C. Cir. 2003). If the agency declarations do

not meet this standard, summary judgment must be denied. Landmark Legal Foundation v.

EPA, 272 F.Supp.2d 59, 66 (D.D.C. 2003) ("'agency affidavits that do not denote which files

were searched, or by whom, do not reflect any systematic approach to document location . . . are

insufficient to support summary judgment.'") (*citing* Weisberg, 627 F.2d at 371); *see also*

Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 326 (D.C. Cir. 1990); Founding Church of

Scientology v. Nat'l Sec. Agency, 610 F.2d 824, 837 (D.C. Cir. 1979).

Notably, none of these cases raised the issue of the adequacy of an agency's search in the

context of a Rule 12(b)(1) motion.  Rather, as the D.C. Circuit has explained, "'*[i]n order to*

*obtain summary judgment* the agency must show that it made a good faith effort to conduct a

search for the requested records, using methods which can be reasonably expected to produce the

information requested.'" CREW v. Nat'l Indian Gaming Comm'n, Civil Action No. 05-0806

(RMC), Memorandum Opinion, May 17, 2006 (attached as Exhibit 2), *citing* Oglesby, 920 F.2d

at 68 (emphasis added).  This is because the issue of whether an agency, here DHS, conducted a

reasonable search necessarily requires a fact-intensive inquiry by the Court.

When measured against these standards it is readily apparent that not only has the Secret

Service failed to demonstrate that it conducted an adequate search, its supporting declaration

raises questions critical to the resolution of this issue that cannot be answered on the current

record.  For example, while Ms. Lyerly attests that "[i]t has been the longstanding practice of the

Secret Service to transfer WAVES records on CD-ROM to the White House Office of Records

Management every 30 to 60 days,"[9] and offers this as an explanation for why the Secret Service

has no responsive records that pre-date October 2004 – the date on which the National Archives

and Records Administration apparently required the Secret Service to maintain these records –

she does not state expressly when this so-called "longstanding practice" began.  Without this

---

[9] Lyerly Decl., ¶13.

critical information there is no way to determine whether there should be WAVES records for any period prior to October 2004.  And absent full compliance with this "practice" – to which Ms. Lyerly does not attest[10] – the Court cannot rule out the existence of additional responsive documents.

Moreover, while Ms. Lyerly states that since October 2004 the Secret Service has maintained WAVES records "in a searchable form on CD-ROM,"[11] and that it did not save WAVES records on CD-ROM prior to October 2004, she does not explain whether or not those records exist in another form, such as in paper format.  Again, even accepting these assertions as true,  without this additional information the Court cannot reasonably conclude that the search conducted by the Secret Service was reasonable.

Equally as troubling is Ms. Lyerly's description of attempts by an inspection team to search the hard drives of two computers in the Secret Service's Presidential Protective Division ("PPD").  She does not explain why these two particular computers were searched, nor does she rule out the possibility that there are other computers there or elsewhere that may contain responsive records.  And with respect to the inspection team's efforts, Ms. Lyerly has no first-hand knowledge whatsoever and can only describe her understanding of what unidentified members of the team "believe."  See, e.g., Lyerly Decl. at ¶17 ("I have been advised that the Inspection team believes that the hard drive of the first computer contains multiple database files

---

[10] Indeed, all Ms. Lyerly does state on this point is that "[t]he *intent* of the Secret Service was to ensure that, once transferred, the records were erased from its computer system."  Lyerly Decl., ¶13 (emphasis added).  She later concedes, however, that this intent was not always carried out, as evidenced by the fact that the Secret Service has found at least some records that remain, even after a transfer to the White House took place.  *See id*. at ¶¶ 14-22.

[11] Id.

of varying degrees of WAVES data that pre-date October 2004."). Ms. Lyerly's understanding

of what certain individuals may "believe," uncorroborated by any evidence or first-hand personal

knowledge, cannot substitute for the "detailed, nonconclusory" declarations that the law

requires. Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476 (D.C. Cir. 1984).

DHS's evidence in support of its argument that it conducted a reasonable search is flawed

in other critical ways. The underlying justification for why the Secret Service has only a limited

number of responsive documents and very few that pre-date October 2004 is, as mentioned

above, its claimed "longstanding practice" to destroy WAVES records once a copy had been

made for the White House. According to Ms. Lyerly, this is because "[o]nce a visitor's visit to

the White House Complex is complete, WAVES and ACR records have no continuing

usefulness[12] to the Secret Service, the Secret Service has no continuing interest in preserving or

retaining them . . ." Lyerly Decl. at ¶26. Conspicuously absent from this declaration, however,

is the reason for why, in October 2004, the Secret Service suddenly changed its longstanding

practice.

As explained in an earlier declaration of Ms. Lyerly filed in Judicial Watch v. U.S. Secret

Service, Civil Action No. 06-301 (JGP), in October 2004, the Secret Service began "temporarily

retaining its own copy of the WAVES records that it transferred to the White House" "*at the*

*request of the National Archives and Records Administration* [NARA]." Second Declaration of

Kathy J. Lyerly ("JW 2nd Lyerly Decl."), ¶2 (emphasis added) (attached as Exhibit 3). The clear

---

[12]This assertion itself is remarkable. The Secret Service, statutorily responsible for the protection of the President of the United States, claims that it has no usefulness for the records it collects which involve the identity and frequency of visitors the White House, where the President lives and works.

implication is that prior to October 2004, the Secret Service's destruction of records did not

conform with the statutorily mandated record keeping requirements administered by NARA.[13]  In

other words, NARA apparently does not agree with the Secret Service that it has no continuing

use for the WAVES and ACR records at issue here.  Yet it is precisely this practice that the

Secret Service offers as justification for the limited results of its search.  *See, e.g.*, Memorandum

in Support of Defendant's Motion to Dismiss Plaintiff's FOIA Claims ("D's. Mem."), p. 9.

Moreover, there is a glaring inconsistency between the stated policy of the Secret Service

to destroy WAVES records prior to October 2004, and its justification for that practice – that

neither WAVES nor ACR records had any continued usefulness to the Secret Service.  If the

Secret Service truly had no continued need for these records– which is hard to accept given the

statutorily mandated mission of the Secret Service – why was it directed to destroy only WAVES

records, but not ACR records?  These lingering questions preclude dismissal or summary

judgment based on the current record.

**D. DHS Has Not Established As A Matter Of Uncontested Fact That It Does Not And Did Not Have Custody And Control Over WAVES Records That Predate October 2004.**

The Secret Service admits that its search did not include WAVES records that it claims

were sent to the White House.  According to the Secret Service, this is because those records

were outside the custody and control of DHS at the time of CREW's request.  D's Mem. at 8-9.

The only evidence offered in support of this claim, however, falls far short of meeting

defendant's burden of proof.

---

[13] In a separate count, CREW has also challenged this record keeping policy of the Secret Service as contrary to the Federal Records Act.

While Ms. Lyerly attests to a "longstanding practice" of the Secret Service to transfer the

WAVES records requested here to the White House (Lyerly Decl. at ¶13) she does not, as

discussed above, detail the duration of this practice, on what it is based, and the source of her

knowledge – a glaring deficit given that she has only been with the Secret Service FOI/PA

Office since December 28, 2003.[14]  Also missing from the record is any discussion of how and

where the records are physically stored.  This is a critical detail given that the Secret Service

operates the WAVES (and ACR) systems from the grounds of the White House itself.  Yet the

Secret Service has not explained the physical location of the computer system that stores the

WAVES (and ACR) records, nor has it explained where the CD-ROM that it forwards to the

White House is physically stored.  And while DHS's counsel has referred to a "mutual

understanding that WAVES records are and would remain under the control of the White

House," D's Mem. at 9, there is no reference whatsoever in Ms. Lyerly's declaration to this

"mutual understanding."  Instead, Ms. Lyerly describes only the unilateral practice of the Secret

Service.  Absent from the record, however, is any actual evidentiary support for DHS's bald

proposition that it has neither possession nor control over the WAVES records created prior to

October 2004.

These omissions are also critical given the behavior of both the defendant and the White

House in this litigation.  During settlement discussions the Secret Service offered to provide all

records requested by the plaintiffs, including documents that the Secret Service claimed to have

turned over to the White House without retaining copies.  *See* DNC's Memorandum of Points

and Authorities in Support of Motion for Immediate Settlement Conference and Proposed

---

[14] See Lyerly Decl. at ¶1.

Scheduling Order, p. 3.  Quite obviously this raises the question of how defendant could provide

copies of documents over which it claims a lack of custody and control.

Subsequent conduct by the White House muddies the waters and raises the specter that it

is the White House that has been calling the shots all along, including in this litigation.  On

September 20, 2006, the date that the Secret Service claims to have sent documents to CREW

(which CREW has never received), the White House made itself available for questions to a

select group of reporters, for whom it provided the records in a CD format.  *See, e.g.*, Sharon

Theimer, White House Logs Don't Show All The Visits By 2 GOP Activists, *Associated Press*,

September 22, 2006 (attached as Exhibit 5).  Why was the White House making a public

disclosure of records the Secret Service claimed to be disclosing in response to FOIA requests to

the Secret Service?  It appears from this course of conduct that the "mutuality" referenced by

DHS's counsel includes mutual custody and control between the White House and the Secret

Service over records CREW has requested under the FOIA.

### E.  DHS Has Not Met Its Burden Of Proving That It Properly Invoked Exemptions Under The FOIA.

Buried in defendant's motion to dismiss is the fact that even if DHS has released

documents to CREW (something CREW disputes), at best it was a partial release.  DHS

acknowledges in a footnote to the background section of its brief that it redacted material from

the WAVES and ACR records pursuant to FOIA Exemptions 2, 6, 7(c), and 7(e).  D's Mem. at 4

n.4.  Completely absent from DHS's brief, however, is any discussion of why, as a factual and

legal matter, these exemptions were properly claimed.

Under the FOIA the agency has the burden of justifying any nondisclosure.  5 U.S.C.

§552(A)(4)(B).  As the Department of Justice has stated in its agency-wide guidance,

"[s]ummary judgment is the procedural vehicle by which nearly all FOIA cases are resolved."

Freedom of Information Act Guide & Privacy Act Overview, May 2004 Edition, p. 804.  DHS

chose not to file a summary judgment motion here, presumably hoping to avoid discovery that

would lead to further (and appropriate) scrutiny of what it has done and why.  But whether it is

done under the guise of a motion to dismiss under Rule 12(b)(1) or a motion for summary

judgment under Rule 56 of the Federal Rules of Civil Procedure, the vehicle the agency chooses

must address what has been redacted and why.  This DHS has failed to do.

The only explanation for the exemptions that Ms. Lyerly offers is so general that the

Court cannot meaningfully determine precisely what has been redacted, much less whether the

redactions meet the legal standards under the FOIA.  There is, for example, no delineation of

what has been redacted or from which specific documents.  For example, Ms. Lyerly claims that

"to protect the security of the Complex, the Secret Service redacted, from WAVES data/records,

limited information from background checks performed by the Secret Service and coded

instructions to Secret Service officers who work in the Complex."  Lyerly Decl., ¶29.  She offers

no further explanation of what this "limited information" is, nor does she explain why its

redaction is necessary to "protect the security of the Complex."  At no point in her declaration

does Ms. Lyerly even state the number of responsive documents that the Secret Service found

(and allegedly produced).  Instead, she describes generally that responsive records were found

for certain named individuals.  This is simply not an adequate factual basis for the Court to

conclude that the exemptions are properly taken.

Moreover, this is not the first time that the Secret Service has failed to offer the requisite

detail as to what it is redacting and why.  Despite an August 9, 2006 order of this Court requiring

defendant to identify the specific documents for which it is claiming an exemption and the

reasons for its position, DHS failed to provide a document-by-document listing of documents

and, to CREW's knowledge, failed to submit an unencrypted and unobscured version for the

Court's *in camera* review in lieu of a public filing.

> **II. CREW REQUIRES DISCOVERY TO RESPOND TO THE MANY FACTUAL ISSUES RAISED IN DEFENDANT'S MOTION TO DISMISS.**

> **A. The Court Should Exercise Its Discretion and Permit Discovery From Defendant.**

Although FOIA cases typically are resolved without the need for discovery, discovery is

not prohibited in FOIA cases. Public Citizen Health Research Group v. FDA, 997 F.Supp 56, 72

(D.D.C. 1998). Discovery should be granted when a plaintiff has made a sufficient showing of

agency bad faith or where a factual dispute exists and the plaintiff has called the declarations

submitted by the government into question. *See* Judicial Watch v. U.S. Department of

Commerce, 34 F.Supp.2d 28, 33 (D.D.C. 1998) (the Court ordered discovery on the issue of the

adequacy of the agency's search for documents and permitted further discovery when evidence

was uncovered that the government illegally destroyed and removed from its custody responsive

documents in an attempt to circumvent FOIA disclosure requirements).

As with any civil litigation, this Court has broad discretion on whether and particularly

what discovery CREW should be granted. *See, e.g.,* SafeCard Servs., Inc. v. Securities and

Exchange Commission, 926 F.2d 1197, 1200 (D.C. Cir. 1991). Where, as here, "one party has

an effective monopoly on the relevant information" the need for discovery is especially acute.

Founding Church of Scientology v. National Security Agency, 610 F.2d 824, 833 (D.C. Cir.

1979).

Defendant's demonstrated lack of respect for the processes of this Court – obviously directed at avoiding scrutiny by the Court and the public – certainly are suggestive of a lack of good faith.  False representations to the Court regarding the production of records to plaintiff may, as well, qualify as "bad faith" – certainly, at a minimum, it is gross negligence.  But CREW does not point to defendant's conduct as a basis for discovery and nor do we seek discovery to determine why defendant misrepresented facts in its brief.  CREW seeks discovery to address the very real and substantive discrepancies raised in the declaration of Kathy J. Lyerly.   As noted above, Ms. Lyerly's declaration gives rise to serious questions about the adequacy of the search performed by defendant.  It raises questions about the control of the documents at issue.  It raises questions about the agency's policy.  If the Court accepts Ms. Lyerly's declaration as prima facie evidence that the search was reasonable, the burden shifts to CREW to rebut that evidence by showing that the search was inadequate.  *See* Moore v. Aspin, 916 F.Supp. 32, 35 (D.D.C. 1996). In order to fairly meet any shifting burden, CREW needs information that is in the control of the defendant and the United States Government.  That information can be obtained efficiently and without disruption through deposition discovery.

CREW seeks to depose Ms. Lyerly, who has placed before this Court three declarations.[15] It is anticipated that through a deposition, we might gain unfiltered and direct answers about the policies, procedures, and methods addressed in her declarations.

In addition, because it is clear that much of what Ms. Lyerly attests to in her declaration is not based on any personal knowledge at all, CREW seeks two separate Rule 30(b)(6)

---

[15]Two of those declarations, which have been referenced and relied upon by defendants in this case, were filed in the Judicial Watch case.  Exhibits 3 and 4.

depositions.  One of those depositions would require defendant to designate a knowledgeable

person regarding the work of the "Inspection team" referenced in Ms. Lyerly's declaration.

Another Rule 30(b)(6) deponent should be designated to address the specifics of the document

search performed by the Presidential Protective Division of the Secret Service.

In order to assist the Court in its truth-seeking function and lead to the resolution of this

case, CREW seeks limited discovery to obtain facts that are material to the allegations raised in

defendant's motion to dismiss CREW's FOIA claims, as well as the legal arguments advanced.

Disclosure through discovery will accelerate the development of a full factual record, and it will

give plaintiff a full and fair opportunity to make its arguments and meet the arguments advanced

by defendant.

### B.  The Court Should Exercise Its Discretion and Permit Third-Party Discovery.

CREW and the Court need information from third parties in order to complete the factual

record in this case and facilitate a decision.  What we request – two third-party depositions from

the United States Government – is certainly not extraordinary.  This is particularly true where, as

here, defendant has placed at issue actions and conduct of two other government entities, the

National Archives and Records Administration and the White House.

Pursuant to Rule 45, CREW seeks the deposition of the unnamed person at the National

Archives and Records Administration ("NARA") who was referenced in paragraph 2 of Ms.

Lyerly's second declaration (which previously has been referred to in this case and was filed in

the Judicial Watch case).  According to Ms. Lyerly's declaration, this person at NARA made the

request to the Secret Service that it retain its own copies of WAVES records.

CREW also seeks a Rule 45 subpoena in order to depose a knowledgeable person in the

White House Office of Records Management, the office within the White House that, according

to Ms. Lyerly, receives the CD-ROMs prepared and transferred by the Secret Service.

The discovery sought is not intrusive or burdensome. These two non-party witnesses will

be in a position to assist the Court because they can provide direct personal knowledge, and as

such, details, about the location of the records at issue. More significantly, their testimony likely

will assist in resolving the factual issue of whether defendant has possession, custody, or control

of these records. These are threshold questions that require resolution, and defendant has placed

them squarely at issue in the case. Without the requested discovery, CREW is significantly and

unfairly prejudiced.

Without the ability to conduct some discovery in this case, CREW is not able to respond

fully to defendant's motion to dismiss CREW's FOIA claims. Defendant's motion raises

disputed material issues of fact, and defendant and the United Sates Government are in control of

the very facts that defendant has placed at issue. Should the Court deny CREW's modest request

for limited discovery, CREW requests, respectfully, that the Court permit CREW to submit

supplemental briefing addressing, further, defendant's motion to dismiss.

Rule 1 instructs that the Federal Rules of Civil Procedure be construed and administered

"to secure the just, speedy, and inexpensive determination of every action." The reasonable

discovery request that CREW makes, that it be permitted to take five depositions,[16] meets the

dictates of this Rule and will serve the interests of justice.

Upon completion of discovery, orderly summary judgment briefing could proceed.

---

[16]Of course, CREW reserves the right to seek additional discovery to supplement the
record, should it be necessary for full and fair adjudication.

**CONCLUSION**

For the forgoing reasons, CREW respectfully requests that the Court deny defendant's

motion to dismiss and permit CREW to take five depositions, including two non-party

depositions.  A proposed order is attached.

Respectfully submitted,

_____

Anne L. Weismann
(D.C. Bar No. 298190
Sharon Y. Eubanks
(D.C. Bar No. 420147
Citizens for Responsibility and Ethics
   In Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C. 20005
Phone: (202) 408-5565
Attorneys for Plaintiff

Dated: September 28, 2006