**EXHIBIT 3**

Case 1:06-cv-00883-RCL   Document 48-4   Filed 09/28/2006   Page 1 of 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JUDICIAL WATCH, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES SECRET SERVICE, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 06-310 (JGP) <br> ) <br> ) <br> ) <br> ) |

### SECOND DECLARATION OF KATHY J. LYERLY SPECIAL AGENT IN CHARGE, LIAISON DIVISION AND FREEDOM OF INFORMATION AND PRIVACY ACTS OFFICER, UNITED STATES SECRET SERVICE

I, Kathy J. Lyerly, hereby make the following declaration:

1. I am submitting this declaration to supplement and modify my May 16, 2006, declaration regarding the United States Secret Service (Secret Service)'s Worker and Visitor Entrance System ("WAVES") records, based on additional information that has become available to me since that declaration.

2. In paragraphs 10 and 11 of my May 16, 2006, declaration, I stated: "It has been the longstanding practice of the Secret Service to transfer WAVES records on CD-ROM to the White House every 30 to 60 days. Except as noted in paragraph 11 below, once the Secret Service transferred the WAVES records, the Secret Service ensured that those records were erased from its computer system. In October 2004, at the request of the National Archives and Records Administration, the Secret Service began temporarily retaining its own copy of the

WAVES records that it transferred to the White House. As such, the Secret Service has in its possession WAVES records dating back only to October 2004." Further, I stated in paragraph 13 of my May 16, 2006, declaration that "the Secret Service only has in its possession WAVES records dating from October 2004."

3. In the course of conducting a Freedom of Information Act (FOIA) search recently regarding a FOIA request not at issue in this litigation, what appeared to be a WAVES record was discovered on the hard drive of a Secret Service computer located in the Information Technology Section of the Secret Service's Presidential Protective Division (PPD). Upon further examination, it appeared that certain WAVES data pre-dating October 2004 existed on the hard drive of that computer and the hard drive of a second computer in the same office.

4. The Secret Service then assembled a team of independent Secret Service representatives under the direction of the Secret Service's Office of Inspection, and I have been informed of the team's findings to date.

5. First, the Inspection team reviewed both the first (older) and second (more recent) PPD computers to determine what, if any, WAVES data pre-dating October 2004 were located on those computers, and the location and time periods of any such data. The review process was accomplished by searching each computer's hard drive for WAVES-related information contained within Microsoft Access database files. The review of these Microsoft Access database files revealed that some WAVES data are in fact stored in these files. The team's review revealed that the only place WAVES data were stored was in Microsoft Access database files. Each Microsoft Access database file was opened manually to determine if it contained

WAVES-related data. If it did, the team documented the location of the database file on the hard drives as well as the report periods of this data (report periods are based upon time of arrival).

6.  I have been advised that the Inspection team believes that the hard drive of the first computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004. The team believes that the database files contain non-comprehensive WAVES data, with sizeable gaps in the report periods. The team also believes that the hard drive of the second computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004. The team further believes that the database files on this computer contain non-comprehensive WAVES data, with gaps in the report periods. The team believes that the validity of the pre-October 2004 WAVES data found on the hard drives of both computers cannot be assured, because some of the data appear to have been used for testing and development. The team believes the pre-October 2004 data have certain elements of WAVES information. The Inspection team further believes that the pre-October 2004 WAVES data found on the hard drives of the two computers appear to exist in a separate location from the folder where the WAVES CD-ROMs are made.

7.  In addition, the Inspection team located on the hard drives of both computers what appear to be WAVES data beginning in October 2004. The Inspection team has not examined these data in detail, but did search the data when the search of all Microsoft Access database files on both computers' hard drives was conducted as described in paragraph 8.

8.  Second, under the direction of the Inspection team, an automated search was conducted through all Microsoft Access database files on both computers' hard drives for the name Jack Abramoff. An automatic search function was designed, developed, and deployed for

3

this purpose. The program's search function searched the hard drives for all Microsoft Access database files, and examined each database file for all records containing the name Jack Abramoff. The program created a report of each database file and any data found. The search function was designed to show results in the format that it is currently stored in the database level (raw); a manual review of the search results was also conducted by the team.

9. I have been advised that the Inspection team has found what appear to be WAVES data containing appointment information for Jack Abramoff. This information would appear to reflect six appointment dates. The Inspection team further found what appear to be additional repeated data entries of WAVES appointment information for Jack Abramoff for these same dates. The WAVES data for one of these dates appear to correspond with the date of one of the two Access Control Record System (ACR) entries/exits previously produced in this case. The Inspection team also found what appear to be two ACR entries/exits reflecting the same dates and times as the records previously produced in this case. In that regard, please see paragraph 14 of my May 16, 2006, declaration. The Inspection team further found what appear to be additional repeated data entries of ACR information for these same dates. The Inspection team believes that it has located all WAVES and ACR data on the two computers with the name Jack Abramoff.

10. The Inspection team determined that WAVES data are on a server. According to standard procedure, every 30 to 60 days, data from that server are downloaded, along with entry/exit data from ACR records, to the hard drive on one of the PPD computers. This information is then used to create the CD-ROMs referenced in paragraphs 10, 11, and 13 of my May 16, 2006, declaration.

4

11. In paragraph 10 of my earlier declaration, I stated that "once the Secret Service transferred the WAVES records [to the White House], the Secret Service ensured that those records were erased from its computer system." The Inspection team has found that the WAVES records on the server, older than 60 days, are purged daily and overwritten on the server. The Inspection team also found, however, that some WAVES data downloaded from the server to the two computers' hard drives remain on the hard drives.

12. I have been advised that the Inspection team's interviews to date of Secret Service employees who were the primary executors of both the WAVES CD-ROMs data transfer process and FOIA requests associated with these records revealed that these executors appear to have followed written download procedures; however, these procedures did not provide guidance on the maintenance of any data left behind in the computers' hard drives. As such, many of the executors were unaware of their existence. The Inspection team's interviews revealed that the individual who currently runs the Information Technology Section of PPD, and his predecessor who served in an interim capacity, did not know that the office computers contained pre-October 2004 WAVES data. Therefore, neither individual had a knowledge or an intent to retain that data.

13. Attached as Exhibit 2 are copies of what appear to be WAVES data concerning Mr. Abramoff printed from a hard drive of one of the computers by a PPD employee prior to the involvement of the Inspection team. Attached as Exhibit 3 are copies of the WAVES and ACR data concerning Mr. Abramoff found in the search by the Inspection team. Exhibit 3 contains the same information as in Exhibit 2, plus additional information. Attached as Exhibit 4 are three one-page summaries prepared by the Inspection team of the WAVES and ACR data found in the

5

team's search. On one of these pages, the last listing of appointment data has been scratched out. I have been advised that a member of the Inspection team indicated that he scratched out this listing because it appeared to be a duplicate of the first listing of appointment data on that same page. Lastly, attached as Exhibit 5 is a spreadsheet which presents data contained in Exhibit 3 in a different format. In the interest of protecting Mr. Abramoff's privacy, the Social Security number and date of birth have been redacted from the documents in all four exhibits. This is the only information redacted from the data.

14. In paragraph 16 of my May 16, 2006, declaration, I explained that there are a variety of reasons why ACR records are not comprehensive as to entries and exits. In that regard, it is noted that turnstiles are not the only source of protection for the White House Complex. Prior to being granted entry, visitors must undergo security checks, provide proper identification, and go through magnetometers as well as other platforms of security.

15. The information contained in WAVES records is provided to the Secret Service temporarily for two limited purposes: (a) to allow the Secret Service to perform background checks to determine whether, and under what conditions, to authorize the visitor's temporary admittance to the White House Complex; and (b) to allow the Secret Service to verify the visitor's admissibility at the time of the visit.

16. Once a visitor's visit to the White House Complex is complete, WAVES and ACR records have no continuing usefulness to the Secret Service, the Secret Service has no continuing interest in preserving or retaining them, and the Secret Service does not control or direct the ultimate disposition or use of the records. The White House does have such a

continuing interest and therefore the records are turned over to the White House Office of Records Management.

17. No other documents responsive to plaintiff's FOIA request were found in the search.

18. No document located in response to plaintiff's request has been withheld in part or in whole, except as noted in paragraph 13.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct to the best of my knowledge and belief.

7/7/06
Date

Kathy J. Lyerly
Special Agent in Charge, Liaison Division and
Freedom of Information and Privacy Acts Officer
United States Secret Service