**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | )<br>)<br>) |
| Plaintiff, | ) |
| v. | )<br>) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | )    Civil Action No. 06-883 (JGP)<br>)<br>) |
| Defendant. | )<br>) |
| DEMOCRATIC NATIONAL COMMITTEE, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>)    Civil Action No. 06-842  (JGP) |
| UNITED STATES SECRET SERVICE, | )<br>) |
| Defendant. | )<br>) |

**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FOIA CLAIMS**

**INTRODUCTION**

The Department of Homeland Security ("DHS"), through its component, the United States

Secret Service, has released to Citizens for Responsibility and Ethics in Washington ("CREW"),

with limited redactions, all records responsive to its Freedom of Information Act ("FOIA") request.

Because CREW has been provided with these records, it cannot seriously be disputed that CREW's

1

FOIA claims are moot. CREW nevertheless speculates that unreleased records may exist, and takes issue with the sworn declaration of Special Agent Kathy J. Lyerly.[1] See Declaration of Kathy J. Lyerly, Special Agent in Charge, Liaison Division, and Freedom of Information and Privacy Acts Officer, United States Secret Service ("Lyerly Decl."), September 21, 2006; Plaintiff's Response to Defendant's Motion to Dismiss Plaintiff's FOIA Claims and Request for Discovery ("Response'), September 28, 2006, at 9. Agent Lyerly's declaration, however, more than demonstrates that DHS conducted a search reasonably calculated to uncover all responsive records. Because that sworn declaration establishes that DHS has undertaken precisely the kind of search required by FOIA, and because CREW does not contend that DHS has acted in bad faith or that other evidence militates against entry of judgment in favor of DHS, CREW is not entitled to the discovery that it now seeks.

At bottom, DHS has produced to CREW all of the records that CREW would be entitled to receive if it were to prevail on its FOIA claims. Those claims are therefore moot and should be dismissed.

## ARGUMENT

## I.    All Responsive Records Have Been Provided to Plaintiff

CREW alleges in its Response that it has not received the records that DHS released on September 20, and therefore that the FOIA claims are not moot. See Response at 3; Lyerly Decl. ¶ 3. Contrary to CREW's allegations of misconduct, undersigned counsel for DHS, Justin Sandberg, placed the records in the outgoing United States mail in the mailroom at the United States Department of Justice on September 20. Mr. Sandberg addressed the envelope to Sharon Eubanks

---

[1] The Secret Service assumes solely for purposes of this motion that the records it has produced and searched are "agency" records as that term is used in the FOIA.

at 11 DuPont Circle, N.W., 2nd Floor, Washington, D.C., 20036 – the address listed on CREW's

FOIA request. *See* CREW's Freedom of Information Act Request, Feb. 2, 2006, at 1 (attached as

Exhibit A to CREW's Second Amended Complaint for Declaratory and Injunctive Relief, August

9, 2006). Using the DuPont Circle address was a mistake; as reflected in the filings in this case,

CREW has moved from this address. DHS first learned that CREW had not received the records

when it read CREW's response, which was filed on September 28 at 5:29 p.m. The very next day,

September 29, DHS sent another copy of the records to CREW by messenger. CREW has

acknowledged receiving the records sent that day. This subsequent release cures any harm allegedly

caused by CREW's failure to have received the records initially. See Response at 5 n.6.

## II.    This Case Is Appropriate For Dismissal Under Federal Rule of Civil Procedure 12(b)(1)

Because Defendant has produced to CREW all of the records that CREW would be entitled

to receive if it were to prevail on its FOIA claims, those claims are moot and should be dismissed

under Federal Rule of Civil Procedure 12(b)(1), which allows a motion to dismiss where the court

"lack[s ] jurisdiction over the subject matter." CREW contends that DHS erred by relying on Rule

12(b)(1) and that DHS chose to file its motion as a motion to dismiss for lack of subject matter

jurisdiction rather than as a motion for summary judgment "to avoid discovery that would lead to

further (and appropriate) scrutiny of what it has done and why". See Response at 8, 13-14. CREW's

contentions are incorrect and unwarranted. Rule 12(b)(1) provides an appropriate procedural vehicle

for DHS's motion: Releasing all non-exempt records responsive to a plaintiff's request renders the

request moot, see, e.g., Perry v. Block, 684 F.2d 121, 125 (D.C. Cir.1982); mootness goes to whether

a court has subject matter jurisdiction, Arizonans for Official English v. Arizona, 520 U.S. 43, 66-67

(1997); and, a defendant should move to dismiss a case for lack of subject matter jurisdiction

pursuant to Rule 12(b)(1), <u>Kirkham v. Société Air France</u>, 429 F.3d 288, 291 (D.C. Cir. 2005).

Thus, CREW's theory about why DHS chose to rely on Rule 12(b)(1) is baseless: DHS employed

Rule 12(b)(1) because it is an appropriate procedural mechanism for seeking dismissal of this case.

## III.    DHS Conducted a Reasonable Search for Records

CREW's challenges to the adequacy of DHS's search are meritless.[2]  To determine whether

a search is adequate, courts look to see if a declaration sufficiently describes "a search reasonably

calculated to uncover all relevant documents," <u>Weisberg v. Dep't of Justice</u>, 745 F.2d 1476, 1485

(D.C. Cir. 1984), which means "a good faith effort to conduct a search for the requested records

using methods which can be reasonably expected to produce the information requested." <u>Oglesby

v. Dep't of Army</u>, 920 F.2d 57, 68 (D.C. Cir. 1990) (noting that an agency is not required to search

every record system).  An agency, to establish the adequacy of its search, need only describe the

"scope and method of the search" in "reasonable detail," <u>Perry v. Block</u>, 684 F.2d 121, 127 (D.C.

Cir.1982), in non-conclusory declarations submitted in good faith, <u>see</u> <u>Steinberg v. United States

Dep't of Justice</u>, 23 F.3d 548, 551 (D.C. Cir. 1994).  As demonstrated in DHS's Opening

Memorandum, Agent Lyerly's declaration easily satisfies this standard.[3]  Opening Memorandum at

---

[2] In this section, DHS responds to the arguments contained in Section C of CREW's response.  CREW also challenges the adequacy of the search in Section D, but for the ease of the reader, DHS will respond to those arguments in a separate section.

[3] In footnote 8 of its response, CREW states that its review of documents released to the Democratic National Committee ("DNC") "raises questions about the completeness of the disclosures" to the DNC.  Specifically, CREW contends that the released documents show a suspiciously precipitous decline in the number of visits to the White House Complex made by Grover Norquist and Ralph Reed after October 2004.  Even if the documents reflect fewer visits after October 2004, CREW's suggestion that the disclosures are flawed is wrong.  First, CREW bases its skepticism about the disclosures on speculation that the rate of visits by Messrs. Norquist and Reed remained constant over time.  Such speculation does not provide grounds for questioning an agency's search.  <u>See</u> <u>Wilbur v. CIA</u>, 355 F.3d 675, 677 (D.C. Cir. 2004).  Second, CREW neglects to point

6-8.

CREW argues that Agent Lyerly's declaration is inadequate because it does not explain when the Secret Service's practice of transferring WAVES records to the White House and erasing the copies on its system began, and so does not rule out the possibility that pre-October 2004 records exist that have not been produced to CREW. Response at 8-9. This argument fails because the adequacy of the Secret Service's search – the relevant issue here – depends on the search described in Agent Lyerly's declaration, not when the practice of transferring and removing records began. See Weisberg, 745 F.2d at 1485 (explaining that the test for adequacy is whether the declaration sufficiently describes "a search reasonably calculated to uncover all relevant documents"). Agent Lyerly's declaration describes a more than adequate search: It demonstrates that skilled Secret Service personnel used reasonable methods to search all established data storage locations where responsive records would reasonably be expected to be found. See Opening Memorandum at 6-8. Essentially, CREW suggests that DHS's search was inadequate because CREW believes that there may be other responsive records. But speculation about the possible existence of responsive records does not suffice to undermine a search. Safecard Services, Inc. v. SEC, 926 F.2d 1197, 1202 (D.C. Cir. 1991) ("Agency [declarations] are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents.")

---

out that DNC requested only records up to May 12, 2005. Thus, the second period in the comparison, the time from October 2004 to May 12, 2005, is small in relation to the first, January 20, 2001 to October 2004. Third, CREW did not request records for Messrs. Norquist and Reed and so does not have standing to challenge the disclosures to the DNC, Freedom of Information Act Request, Feb. 2, 2006, at 1 (attached as Exhibit A to CREW's Second Amended Complaint for Declaratory and Injunctive Relief, August 9, 2006); Haskell Co. v. United States Dep't of Justice, 2006 WL 627156, at *2 (D.D.C. March 13, 2006) (concluding that only the FOIA requester has standing to challenge the processing of its request), which has voluntarily settled its case with DHS, DNC v. United States Secret Service, 06-CV-842 (D.D.C.) (Docket No. 25.).

(internal citations and quotations omitted from parenthetical).

CREW's next contention, that Agent Lyerly's declaration does not support dismissal because it does not state that pre-October 2004 records were not saved somewhere other than on two computers in the Information Technology ("IT") Section of the Presidential Protective Division ("PPD"), also fails because it requires a more detailed declaration than the law requires. Agent Lyerly explained the Secret Service's pre-October 2004 practice for handling WAVES records: It downloaded WAVES information from the server to the computers in the IT Section of the PPD, copied the records on to CD-ROM, transferred the CD-ROM to the White House, and erased the records from the server. Lyerly Decl. ¶¶ 13, 19-20. The Secret Service found that, though it intended to erase the records from its computer system, some pre-October 2004 information remained on the hard drives of the computers in the IT Section of the PPD used to create the CD-ROMs. Id. ¶¶ 13, 17, 20. Thus, the declaration's narrative demonstrates that the format in which the Secret Service possessed pre-October 2004 information would be an electronic one on the hard drives of the computers (and that the Secret Service conducted a search for such information and released it to plaintiff.) Id. ¶¶ 13, 16, 17, 19, 20, 31-32. CREW's contention that the records may exist in some other format does not follow from anything in the declaration; it is a matter of sheer speculation, which does not suffice to undermine defendant's position that it conducted a reasonable search, see, e.g., Safecard Services, Inc., 926 F.2d at 1202. Agent Lyerly's declaration is not deficient simply because it does not address every conceivable point of speculation CREW raises.

CREW also criticizes other aspects of the declaration related to the Inspection Team's search of two computers in the IT Section of the PPD. Response at 9-10; see Lyerly Decl. ¶¶ 14, 16, 21. CREW contends that Agent Lyerly's declaration does not explain why these two computers were

6

searched or state that there are no other computers that may contain responsive records. Response at 9. Then, CREW challenges the declaration's reliance on second-hand knowledge in describing the Inspection Team's findings. Response at 9-10.

Neither of these criticisms stands up to scrutiny. Contrary to CREW's first contention, Agent Lyerly's declaration offers an explanation for why the IT Section computers were searched for WAVES records: They were used to create the WAVES CD-ROMs. Lyerly Decl. ¶¶ 17, 19. The notion that the Secret Service should have perused *other* computers, which there is no reason to believe would have responsive documents, is the irrelevant product of CREW's speculation. See, e.g., Wilbur, 355 F.3d at 677; Safecard Services, Inc., 926 F.2d at 1202.

CREW's second criticism of the Inspection Team search borders on the frivolous. The D.C. Circuit has explicitly held that a declarant in a FOIA case can rely on second-hand knowledge in describing a search in order to provide a comprehensive declaration. Safecard Serv., Inc., 926 F.2d at 1201-02 (permitting affiant to rely on second-hand information in order to provide a comprehensive affidavit describing a FOIA search). See also Meeropol v. Meese, 790 F. 2d 942, 951 (D.C. Cir. 1986); Brophy v. United States Dep't of Defense, 2006 WL 571901, at *4 (D.D.C. March 8, 2006). That is what Agent Lyerly did here: She relied on what the Inspection Team told her about its search, see, e.g., Lyerly Decl. ¶ 17, to provide a comprehensive declaration describing the overall search for records responsive to CREW's request, see Lyerly Decl.

CREW's last set of arguments in Section C attacks the declaration for failing to explain the rationale behind the Secret Service's record-handling practices. See Response at 10-11. For example, CREW takes the declaration to task for not explaining the rationales behind the decisions to retain CD-ROMs or treat WAVES and ACR records differently, and implies that the silence

suggests that DHS cannot justify its record-handling decisions.  Id.  In fact, the declaration's silence about these points says something completely different, namely, that they are irrelevant to the FOIA claims.  FOIA is not a document retention statute.  Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136, 151-52 (1980).  Thus, the reasons behind the Secret Service's record-handling decisions are irrelevant to DHS's motion to dismiss CREW's FOIA claims; they say nothing about the adequacy of the Secret Service's search for responsive records.[4]  Accordingly, CREW's last set of arguments fails.

## IV.    WAVES Records Transferred to the White House Are Outside of the Secret Service's Control

CREW attempts to undercut DHS's motion to dismiss by contending that DHS controls pre-October 2004 WAVES records that are no longer in DHS's possession.  Response at 11-13.  This contention is false.  The information at issue – pre-October 2004 WAVES information that was transferred to the White House (before CREW submitted its FOIA request) and was not retained on the computers in the IT Section of the PPD[5] – is, and was at the time of CREW's request, in the exclusive custody and control of the White House.  See Lyerly Decl. ¶¶ 13, 17, 25, 26.

CREW asserts that Agent Lyerly's declaration does not support dismissal because it omits critical details necessary to evaluate the argument that records transferred to the White House are

---

[4] CREW has challenged the policy in a separate count of the complaint (Claim Four), which is not at issue in this motion.  Claim Four is subject to a separate pending motion to dismiss.  See Docket No. 34.

[5] This is the only information at issue because, contrary to CREW's suggestion that DHS has not released any WAVES data that pre-dates October 2004, Response at 11, DHS has released, with limited redactions, all responsive pre-October 2004 WAVES information (all of which was retained on the hard drives of the two PPD computers) that it possessed as of the date of the search.  Lyerly Decl. ¶¶ 13, 16, 17, 19, 20, 31-32.

outside of Secret Service's control, namely, details about how and where the WAVES records are stored at the White House. Id. These details are critical, CREW maintains, because "the Secret Service operates the WAVES (and ACR) systems from the grounds of the White House itself." Id.

CREW's argument fails because it confuses the White House as a governmental entity with the White House as a physical structure. The declaration's discussion of transferring the records to the White House uses the term "White House" to refer to the White House Office as a governmental entity, not as a physical structure. See Lyerly Decl. ¶ 13 (explaining that records are transferred to the White House Office of Records Management [also "WHORM"]); see United States Gov't Manual 86-87 (Gov't Printing Office 2006-2007) (discussing the White House Office). Thus, it does not matter where or how the records are being stored after they are transferred, because they are being controlled by the White House Office of Records Management. See U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 145 (1989) (noting that a document must have been controlled by the agency at the time of the request for it to be an "agency record" under FOIA); Lyerly Decl. ¶¶ 25-26.

CREW raises three other points with regard to control. First, CREW questions the declaration's adequacy based on the fact that, unlike the brief, it does not use the term "mutual understanding" to describe the consensus regarding the control of the pre-October 2004 WAVES records (that were transferred to the White House and not stored on the PPD computers). Response at 12. Second, CREW contends that DHS made an offer of settlement to produce records, including records transferred to the White House (before CREW filed its FOIA request), in exchange for dismissal of the case in its entirety (i.e., dismissal of the FOIA and Federal Records Act claims, and that such offer provides proof that the Secret Service controls WAVES records transferred to the White House. Id. at 12-13. Third, CREW suggests that the White House and the Secret Service

mutually control WAVES records because the White House has released to reporters records that the Secret Service released (through the Department of Justice) to CREW. Id. at 13.

Each of CREW's arguments fails. The declaration describes a mutual understanding regarding the control of pre-October 2004 WAVES records not stored on the computers in the IT Section of the PPD in that it details the Secret Service's lack of control over the records, Lyerly Decl. ¶¶ 25-26; see also Opening Memorandum at 8-12; Burka v. U.S. Dep't of Health & Human Servs., 87 F.3d 508, 515 (D.C. Cir. 1996) (laying out the four elements that courts look to when assessing control), and explains that "[t]he White House [has] . . . a continuing interest [in the records] and therefore the records are turned over to the White House Office of Records Management," Lyerly Declaration ¶ 26. With regard to settlement, even if such an offer were made,[6] it would not demonstrate that the Secret Service controls the relevant records. Rather, it would demonstrate simply that DHS could turn over records in the White House's control if the White House agreed to allow it to do so, even when DHS has no obligation to produce such records. CREW's speculation about the meaning of this offer is both incorrect and irrelevant.[7] See Wilbur, 355 F.3d at 677. Finally, CREW's claim of mutual control is nonsensical. In this case, control matters only insofar as it relates to records that were transferred to the White House before CREW submitted its FOIA request because DHS has released, with limited redactions, all other records responsive to CREW's

---

[6] Settlement discussions are intended to be confidential and not disclosed to the trier of fact. See, e.g., Local Rule 84.9(a) (barring disclosure of any written or oral communications arising in court-ordered mediation, and prohibiting communication between the mediator and the assigned judge). CREW has flouted this commonly understood principle by publicly mischaracterizing the substance of settlement discussions. See Press Release, CREW, CREW Reveals What the White House Has Not Released About the Abramoff Secret Service Records (September 21, 2006), at http://www.citizensforethics.org/press/newsrelease.php?view=157 (visited on October 4, 2006).

request.[8]  DHS's release of records to CREW in no way evidences mutual control over these pre-

October 2004 records because DHS has not released – and need not release under FOIA– any records

that were in the White House's exclusive possession (and control) at the time of the request.  See

Lyerly Decl. ¶¶ 13, 17, 20, 22.  On the other hand, <u>DHS has released all responsive records that were

in the Secret Service's possession and control at the time of the request</u>.

## V.    The Limited Redactions Made by DHS Are Legally Sound and Adequately Supported

CREW challenges the legal and factual justifications offered by DHS for the limited

redactions made in the records released to CREW.  Response at 14; <u>see</u> Opening Memorandum at

4 n.4.  CREW contends that the declaration offers "no delineation of what has been redacted or from

which specific documents," Response at 14, and that the brief does not provide an adequate legal

justification for these redactions, <u>id.</u> at 13.[9]

DHS has provided proper factual and legal support for the two kinds of redactions challenged

by CREW, namely those designed to protect individuals' privacy and the security of the White

House complex.  With regard to the former, the declaration specifically identifies the information

that has been redacted (dates of birth and social security numbers) and from what documents it has

been redacted (WAVES documents).  Lyerly Decl. ¶ 29.  For its part, the brief provides sufficient

legal justification for these redactions, FOIA Exemptions 6 and 7(c), <u>see</u> 5 U.S.C. § 552(b)(6), (7)(c);

Opening Memorandum at 4 n.4, which are clearly appropriate, <u>National Ass'n of Retired Federal

Employees v. Horner</u>, 879 F.2d 873, 879-880 (D.C. Cir. 1989) (concluding that individuals' names

_____

[8]  In other words, DHS has not withheld records in its possession at the time of the search by
asserting that it does not control such records.  But DHS assumes that it controls these records only
for purposes of this motion.

[9]  CREW previously indicated that it would not challenge these limited redactions.

11

and addresses should be redacted from records pursuant to Exemption 6 to protect their privacy).

CREW's argument fares no better with respect to the redactions made to protect the security of the White House Complex. The declaration identifies the information that has been redacted ("limited information from background checks performed by the Secret Service and coded instructions to Secret Service officers who work in the Complex," Lyerly Declaration ¶ 29) and the documents from which it has been redacted (WAVES documents), while the opening memorandum provides the necessary legal justification, Exemptions 2(high), 6, 7(c), and 7(e), see 5 U.S.C. § 552(b)(2), (b)(6), (7)(c), (7)(e). Opening Memorandum at 4 n.4. These redactions too are clearly appropriate.[10] Horner, 879 F.2d at 879-880; see Schwarz v. United States Department of Treasury, 131 F.Supp. 2d 142, 150 (D.D.C. 2000) (concluding that "information concerning personal characteristics used by the Secret Service in evaluating the dangerousness of a subject and the threat potential to individuals protected by the Secret Service" is "clearly exempt from disclosure" pursuant to Exemptions 2 and 7(e)).[11]

## VI.  Discovery Should Be Denied

The Court should deny CREW's request for discovery because Agent Lyerly's declaration discharged DHS's threshold burden to demonstrate that it performed a reasonable search, and CREW

---

[10] If the Court concludes that the declaration lacks details necessary to allow the Court to assess the claimed redactions, then it should permit DHS to submit a supplemental declaration further explaining them. See, e.g., Accuracy in Media, Inc. v. United States Secret Service, 1998 WL 185496, at *5 (D.D.C. April 16, 1998).

[11] In the course of assailing the declaration, CREW asserts, "[a]t no point in her declaration does Ms. Lyerly even state the number of responsive documents that the Secret Service found (and allegedly produced)." Response at 14. CREW is wrong. In paragraph three of the declaration, Agent Lyerly states that the Secret Service's search "uncovered 356 pages of responsive records which were redacted . . . and, on September 20, 2006, released."

cannot overcome the presumption against discovery that applies once an agency has met its burden. Discovery in FOIA cases is rare. See, e.g., Wheeler v. CIA, 271 F.Supp. 2d 132, 139 (D.D.C. 2003) ("Discovery is generally unavailable in FOIA actions."); Pub. Citizen Health Research Group v. FDA, 997 F.Supp. 56, 72 (1998) ("Discovery is to be sparingly granted in FOIA actions."). If a court is satisfied that the government has, by providing a reasonably detailed declaration, met its initial burden of demonstrating that it conducted an adequate search, then, to secure discovery, a plaintiff must make a showing of bad faith by the agency sufficient to impugn its declaration or provide some tangible evidence establishing that judgment in favor of the agency is otherwise inappropriate. Carney v. United States Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994); Judicial Watch, Inc. v. Export-Import Bank, 108 F.Supp. 2d 19, 25 (D.D.C. 2000).

CREW pins its hopes for securing discovery on the claim that DHS has not satisfied its threshold burden to demonstrate that it performed an adequate search. See Response at 16. Specifically, CREW argues that Agent Lyerly's declaration raises questions about, among other things, the adequacy of the search and DHS's record retention policy. Id. But the only issue relevant to this motion is the adequacy of the search. The questions about DHS's record-keeping practices, as demonstrated above, see supra pp. 5, 7-8, are not pertinent to the resolution of the instant motion. Whether the case is moot (it is), depends on whether DHS performed a search reasonably calculated to uncover all responsive documents, appropriately made redactions, and released all responsive, non-exempt material to CREW. Tijerina v. Walters, 821 F.2d 789, 799 (D.C. Cir. 1987) (concluding that the case was moot because the agency had released all non-exempt material to plaintiff); Perry, 684 F.2d at 125 (same). (CREW even concedes that these are the appropriate elements for assessing mootness. Response at 6.) The propriety or timing of DHS's records-keeping practices says nothing

about the reasonableness of the Secret Service's search for records, the appropriateness of any redactions, or the release of the documents. In fact, the Secret Service searched in all established data storage locations where records would reasonably be expected to be found given the Secret Service's record handling practices. See Lyerly Decl. ¶¶ 6, 12-14, 17, 19-20, 21.

As suggested above, DHS has discharged its burden of demonstrating that it performed an adequate search: Agent Lyerly's declaration describes, in more than reasonable detail, that skilled agency personnel, Lyerly Decl. ¶¶ 11, 16, using appropriate methods, id. ¶¶ 12-13, 21, searched all of the established data storage locations where responsive records would reasonably be expected to be found, id. ¶¶ 12-13, 17-20. See Opening Memorandum at 6-8.

One search, what DHS has termed the PPD search, was conducted by individuals who perform FOIA searches as part of their regular responsibilities. Lyerly Decl. ¶ 11. The other primary search, the Inspection Team search, which was computer-based, was conducted by, among others, an individual who oversees all information technology programs for the Secret Service's Office of Investigation, a member of the Electronic Crimes Special Agent program, who is a computer specialist trained in the forensic examination of computers, and an Information Technology Specialist in the Information and Resources Management Division, who is a computer specialist skilled in database design and architecture. Id. ¶ 16. Both groups of searchers used appropriate methods to search the various databases. The individuals who performed the PPD search searched ACR records and WAVES records (on CD-ROM) by visitor name, id. ¶¶ 12-13, and the Inspection Team searched the two computers discussed earlier with a search function that scoured pertinent files on the hard drives for the names provided in CREW's FOIA request. Id. ¶ 21. Finally, together, both groups of searchers looked for responsive records in all established data storage locations where

14

they would reasonably be expected to be found given the Secret Service's record handling practices, namely, on the ACR database, the CD-ROMs on which the post-October 2004 WAVES records are stored, and the computers used to create the WAVES CD-ROMs.  See Lyerly Declaration ¶¶ 12, 13, 16, 19-20.  The search teams did not err by failing to search any pre-October 2004 documents that had not been retained on the hard drives of two computers in the IT Section of the PPD.  Such records could not be searched because the Secret Service does not maintain them; there is nothing to search.  Any such records were in the exclusive custody and control of the White House, Lyerly Declaration ¶¶ 25-26; Opening Memorandum at 8-12; see supra p. 10, and so were not agency records subject to FOIA, Tax Analysts, 492 U.S. at 145.

To be clear, CREW does not request discovery on the basis of any purported governmental misconduct or evidence that other records exist.  For all of its blustering about alleged governmental misconduct, CREW expressly declines to argue that the purported misconduct evidences bad faith that supports discovery: "CREW does not point to defendant's conduct as a basis for discovery." Response at 16.  CREW eschews this option for a good reason – there was no misconduct.  CREW also passes on the opportunity to argue that evidence demonstrates that the Secret Service possesses other responsive records, because it has no such evidence.  See Response at 16 ("In order to fairly meet any shifting burden, CREW needs information that is in the control of the defendant and the United States Government).[12]  Because DHS has discharged its threshold burden, and CREW does not contend that DHS acted in bad faith or that other evidence militates against judgment as a matter of law, the Court should deny CREW's discovery request.

---

[12]  A plaintiff in a FOIA case cannot secure discovery based on the hope that it might find evidence in discovery that will help its cause.  Founding Church of Scientology v. NSA, 610 F.2d 824, 837 n.101 (D.C. Cir. 1979).

CREW's specific requests for discovery suffer from defects separate and apart from the foundational one detailed above. CREW seeks to depose a individual knowledgeable about the PPD search and a member of the Inspection Team pursuant to Rule 30(b)(6), arguing that such depositions are appropriate because Agent Lyerly's declaration relies on second-hand knowledge. Response at 16-17. This argument is meritless. As DHS explained above, see supra p. 7, the D.C. Circuit has held that declarants in FOIA cases can rely on second-hand knowledge to describe searches, Safecard Serv., Inc., 926 F.2d at 1201-02; see also Meeropol, 790 F. 2d at 951. Thus, Agent Lyerly's reliance on second-hand knowledge does not support CREW's discovery request.

CREW also seeks to depose an individual from the National Archives and Records Administration ("NARA") and an individual from the White House Office of Records Management. Response at 17-18. These requests are similarly devoid of merit. CREW wants to depose someone from NARA presumably to elicit information about the propriety of DHS's record-keeping practices. See Response at 11, 17. But the appropriateness of these practices is irrelevant to this motion, see supra pp. 5, 7-8, 13-14, so even if CREW is permitted discovery, it should not be permitted to depose an individual from NARA.[13] CREW's request to depose someone from the White House, Response at 17-18, should similarly be rejected. If the Court orders discovery,[14] which it should not, an individual from the Secret Service could testify to the Secret Service's lack of possession and

---

[13] DHS has been unable to locate any FOIA case in which a court granted discovery against a third-party agency.

[14] The Supreme Court has stated that, in certain circumstances, parties seeking discovery from the White House in civil litigation are required to make an exceptionally strong and particularized showing of relevance and need. Cheney v. United States Dist. Ct., 542 U.S. 367, 385-86 (2004).

control of pre-October 2004 records that were not retained on the two PPD computers.[15]

Finally, CREW asks that it be permitted to file a supplemental brief if the Court denies its request for discovery. Response at 18. CREW should not be permitted to file such a brief because it could have addressed in this response, or could address in its sur-reply, any topic that it could address in a brief written after a denial of its request for discovery.

## CONCLUSION

For the above stated reasons, and those provided in Defendant's opening memorandum, the Court should dismiss CREW's FOIA claims and deny its request for discovery.


Dated: October 5, 2006                          Respectfully submitted,


                                                PETER D. KEISLER
                                                Assistant Attorney General

                                                JEFFREY A. TAYLOR
                                                Acting United States Attorney

                                                CARL J. NICHOLS
                                                Deputy Assistant Attorney General

                                                JOSEPH H. HUNT
OF COUNSEL:                                     Branch Director

MOLLY WEBER                                     s/ Justin M. Sandberg____
United States Secret Service                    ELIZABETH J. SHAPIRO
                                                (D.C. Bar No. 418925)

---

[15]    If the Court concludes that there are gaps in Agent Lyerly's declaration, it should allow her to provide another declaration to fill in any gaps before deciding to allow CREW to conduct discovery. See, e.g., Hardy v. United States Dep't of Defense, 2001 WL 34354945, at *5-6 (D. Ariz. Aug. 27, 2001); Accuracy in Media, Inc., 1998 WL 185496, at *5. This procedure would conserve resources by allowing Agent Lyerly to quickly rectify any inadvertent omissions in her declaration. To be clear, though, DHS does not believe that there are any such omissions.

Assistant Branch Director
SARA CLASH-DREXLER
(Pa. Bar No. 86517)
Trial Attorney
JUSTIN M. SANDBERG
(Ill. Bar. No. 6278377)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. #7224
P.O. Box 883 Ben Franklin Station
Washington, D.C. 20044
Telephone:  (202) 514-3489
Facsimile:  (202) 616-8202
E-mail:  justin.sandberg@usdoj.gov

Attorneys for Defendant