UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| THE WASHINGTON POST,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 06-1737 (RMU)<br>)<br>)<br>)<br>)<br>)<br>) |

SUPPLEMENTAL DECLARATION OF PAUL S. MORRISSEY
DEPUTY ASSISTANT DIRECTOR
UNITED STATES SECRET SERVICE

I, Paul S. Morrissey, hereby make the following declaration:

1.  I previously submitted a declaration in this action dated October 13, 2006. The statements made herein are based on my personal knowledge or information made available to me in my official capacity.

2.  I am the Deputy Assistant Director of the Office of Protective Operations for the United States Secret Service (hereinafter "Secret Service"), which is a component of the Department of Homeland Security ("DHS"). I have held this position since September, 2006 and have been a special agent with the Secret Service since January, 1983.

3.  The Secret Service is a protective and law enforcement agency operating under the provisions of Title 18 of the United States Code, Sections 3056 and 3056A. Pursuant to Section 3056, the Secret Service is charged with the protection of the President and Vice President of the United States and their immediate families; major candidates for President and

Vice President of the United States and their spouses; the President-elect and Vice President-elect and their immediate families; former Presidents of the United States, their spouses and minor children; visiting foreign heads of state and heads of government; and other individuals as directed by the President of the United States. Additionally, the Secret Service is authorized to provide security for the White House and the Vice President's official residence; foreign embassies and missions in the Washington, D.C. area, and certain other locations within the United States; designated events of national significance, including National Special Security Events; as well as other locations.

4. The Office of Protective Operations is one of eight directorates that manage various operational and support functions within the Secret Service. It is responsible for establishing policies related to the Secret Service's protective mission and for overseeing the operational divisions that protect the persons, places and events that the Secret Service is authorized by statute and Executive Order to protect.

5. The Washington Post filed a Freedom of Information Act ("FOIA") request with the Secret Service for records generated since October 2004 reflecting visits by any persons to (i) the Vice President and any of twelve named staff members in the Office of the Vice President (also "OVP") and (ii) the Vice President's Residence, except for visits made by members of the Vice President's family. It is my understanding that the Court has ordered the Secret Service to produce these records unless they are exempt under the FOIA.

6. The "White House Complex" (also "Complex") as secured by the Secret Service includes the White House, the Eisenhower Executive Office Building ("EEOB"), the grounds encompassing the EEOB and the White House, and the New Executive Office Building. Housed

in the White House and the EEOB are the offices of various staff of the Executive Office of the President (also "EOP") as well as offices for the staff of the OVP, including the Executive Branch office of the Vice President himself. The secured area of the White House Complex also includes all of the office space used by the OVP in the White House Complex.

### White House Complex Records Request

7. The Washington Post's FOIA request at issue in this case specifically requests disclosures of Worker and Visitor Entrance System ("WAVES") and Access Control Records ("ACR"). As I explained in my earlier declaration, the ACR system and the WAVES are used to monitor the access of visitors to the White House Complex, including the EOP and the OVP. These same systems are used whether visits pertain to the EOP or the OVP.

8. ACR records consist of records generated when a pass holder, worker, or visitor swipes his or her pass over one of the electronic pass readers located at entrances to and exits from the White House Complex. ACR records include information such as the pass holder's name and badge number, the time and date of the swipe, and the post at which the swipe was recorded. ACR records do not include information about who the pass holder is visiting in the Complex, the visitor's affiliation to the Vice President, the OVP, or any outside organization, or the reason for a person's visit.

9. WAVES records consist of records generated when information is submitted by an authorized White House pass holder to the Secret Service about workers and visitors who need access to the White House Complex to perform work, conduct business, or attend events. Authorized White House pass holders include members of both the President's and Vice President's staffs. WAVES records include the following information submitted by the

authorized pass holder: the visitor's name, date of birth, and Social Security number; the time and location of the planned visit; the name of the pass holder submitting the request; the name of the person to be visited; the date of the request; and the general category into which the visitor falls – worker, member of the press, individual on an access list (such as a volunteer, courier, or temporary staff member), or individual with an appointment. They may also include limited information from background checks performed by the Secret Service and coded instructions to Secret Service officers. Once a visit takes place, WAVES records are typically updated electronically with information showing the actual time and place of the visitor's entry into and exit from the White House Complex.

10. WAVES records as they exist after a visit include a visitor's information from ACR records such as the badge number, the date and time of entry and exit, and the place of entry and exit. The remaining ACR fields are strictly internal to the system. One such field is the "Access Log Id," which is a sequential number of the record in the table.

11. Since at least 2001, it has been the practice of the Secret Service to transfer newly-generated WAVES records on CD-ROM to the White House Office of Records Management (the "WHORM") every 30 to 60 days. (In May 2006, the Secret Service entered into a memorandum of understanding ("MOU") that both documented past practice regarding WAVES and ACR records and formalized the recognition of the legal status of those records and WHORM's management and custody of those ACR and WAVES records. A true and accurate copy of the MOU is attached hereto as Exhibit 1.) It was the intent of the Secret Service that once transferred to the WHORM, the records were to be erased from its computer system. With regard to the time period at issue in the Washington Post's request (October 2004 to present), in

October 2004, because of a request from the National Archives and Records Administration, the Secret Service began temporarily retaining a copy of the WAVES records that it transferred to the WHORM. Thus, at the time of the Washington Post's FOIA request, the Secret Service had WAVES and ACR records for the period relevant to the Post's request.

12. The information in WAVES records submitted by an authorized White House pass holder is provided to the Secret Service temporarily for two limited purposes: (1) to allow the Secret Service to perform background checks to determine whether, and under what conditions, to provide for the visitor's temporary admittance to the White House Complex; and (2) to allow the Secret Service to verify the visitor's admissibility at the time of the visit. Once a visitor's visit to the White House Complex is complete, the Secret Service has no continuing interest sufficient to justify preservation or retention of WAVES or ACR records, and the Secret Service does not control or direct the ultimate disposition or use of the records.

13. I have been advised that the Secret Service released WAVES and ACR records in Judicial Watch v. United States Secret Service, 06-CV-310 (D.D.C.); Democratic National Committee ("DNC") v. United States Secret Service, 06-CV-842 (D.D.C.), and Citizens for Responsibility and Ethics in Washington ("CREW") v. Department of Homeland Security, 06-CV-883 (D.D.C.). I understand that the Secret Service's releases were made only after the Office of the President, in the exercise of its discretion, expressly authorized these releases.

14. In specific regards to ACR records, ACR records do not indicate who a person entering the Complex is scheduled to visit. Therefore, there is no way of determining, from their face, which ACR records reflect a visit by someone to see the Vice President or a member of his staff. Locating the ACR records that correspond to WAVES records responsive to the

Washington Post's FOIA request would be an enormously time-consuming task.

15. It is estimated that for the relevant time period, there are approximately 65,000 WAVES records, encompassing an estimated 9,983 pages, that reflect visits to the Vice President or one of the twelve staff members named in the request. Some of these WAVES records may be duplicates. It is estimated that these records involve 2,964 unique visitor names. Relatedly, there are probably tens of thousands of ACR records that correspond to these WAVES records.

16. The Secret Service has searched for and gathered the WAVES records responsive to the Washington Post's FOIA request which include the information from ACR records other than which is strictly internal to the system. However, the Secret Service has not gathered the additional ACR record information. In order to locate the ACR records corresponding to the responsive WAVES records in this case, the Secret Service would need to use the following procedure. First, it would import the information from the WAVES records into a program that would allow it to determine how many unique visitors there are in the records sought. This has been done and it is estimated that there are approximately 2,964 unique visitor names. Second, the Secret Service would search the entry/exit records (ACR and WAVES) by the visitor's name. Presently, ACR records cannot be electronically searched by simultaneously using multiple criteria, such as visitor name _and_ time of visit. It is estimated that it would take an individual approximately 25 weeks to complete the second step of this process even with the assistance of an automated search program. This estimate is based on the assumptions of 20 minutes per unique visitor's name, 2,964 unique visitor names, and 40 hours of work per week. It is noted that at best, no more than a few searches may be run simultaneously, and that running simultaneous searches may run the risk of computer failure. Third, the records yielded by the

search conducted in step 2 could include records of visits to people other than those listed in the Washington Post's FOIA request. Therefore, it would then be necessary to sort through the entry/exit records pertaining to each unique visitor name to determine which of the ACR records correspond to the responsive WAVES records generated through the Washington Post's FOIA request. To accomplish the matching, the Secret Service would need to conduct a careful manual examination, comparing the ACR records produced through step 2 to the WAVES records responsive to the Washington Post's FOIA request. The matching would be a comparison of criteria such as date and time.

17.     In addition to the ACR records search, in order to process WAVES records, the Secret Service would need to refer the WAVES records to the OVP. WAVES records reflect the general category within which a visitor to the Complex falls, but for individuals with appointments, WAVES records do not reflect the purpose of the appointment, or the visitor's affiliations to the Vice President, the OVP, or outside organizations. In other words, the records do not state whether a person is coming to the Complex for a social visit or to talk about policy matters. The purpose of a person's appointment, moreover, is not the Secret Service's concern; the Secret Service's sole concern is whether the person presents a security risk, and it can assess this without knowing the purpose of an appointment. There are some limited exceptions to WAVES records not stating the reason for a person's appointment, such as the records occasionally reflect that a person is being admitted to the Complex for a holiday party, departure photo, or some other large group function. Therefore, it is my understanding that if there are FOIA exemptions applicable to these records that depend on the nature of the appointment - whether for official business, or to pay a social call - then the Secret Service Freedom of

Information and Privacy Acts (FOI/PA) Office would need to refer the records to the OVP for review.

### Vice President's Residence Records Request

18.     The Secret Service does not use the WAVES or ACR systems for access control purposes at the Vice President's Residence.  The Secret Service has, however, identified essentially seven categories of records responsive to the Washington Post's request for records concerning visits to the Vice President's Residence:  (i) permanent access lists of those individuals who regularly enter the Residence complex, including OVP staff, military personnel, contractors, service workers, and members of the Vice President's family; (ii) daily access lists of individuals having appointments to meet with OVP staff, military personnel, the Vice President, or his family, as well as service workers requiring access to the complex to perform non-routine services, maintenance, and repairs; (iii) a database containing information regarding individuals seeking access, used for generating both the permanent and daily access lists; (iv) requests for access, from OVP staff, military and Secret Service personnel, received primarily by electronic mail and occasionally by facsimile or other means; (v) post entry logs recording the names of the persons who enter the Residence complex on a particular date, with their times of entry; (vi) daily Watch Commander Journals containing a variety of information not requested by the Washington Post, but which from time to time also note the entry of particular individuals to the Vice President's Residence; and (vii) lists of invited guests and workers pertaining to special events.

19.     As I noted in paragraph 12 of my earlier declaration, it has been the consistent practice of the Secret Service to update the permanent access list (which is maintained on a

computer database) as changes are made in authorized personnel; to dispose of daily access lists on a daily basis while purging the daily access database of information every 30 days; and to transfer post entry logs to the OVP on a monthly basis. On June 19, 2006, however, the Secret Service directed that records concerning access to the Vice President's Residence be maintained. The records were to be maintained pending the ultimate resolution of FOIA requests, including the Washington Post's FOIA request. Consequently, the Secret Service has several months' worth of permanent access lists, daily access lists, post entry logs, and computer database entries potentially responsive to the Washington Post's request. The Secret Service also has Watch Commander Journals dating for the full period of the Washington Post's request, electronic mail requests dating to April 2006, and some special event lists and faxed access requests within the time period.

20.     It is estimated that together, the permanent access lists, daily access lists, post entry logs, and responsive Watch Commander Journal entries total approximately 1,000 pages. In addition, it is estimated that there are approximately 1,000 electronic mail and/or facsimile requests for access. These access requests are divided between requests from OVP staff, the military, and the Secret Service. The e-mails may also have attachments listing multiple individuals for whom access is requested.

21.     Generally speaking, many of the records concerning visitor access to the Vice President's Residence contain personal information, such as visitors' dates of birth and Social Security numbers, as well as law enforcement sensitive information. This information would have to be redacted before the records could be disclosed. The majority of the redactions would need to be done on a line-by-line basis.

22. It is my understanding that a practical obstacle to processing these records would be the determination of which FOIA exemptions apply to them. As a general rule, when military personnel make a request for visitor access, they provide some explanation of the visitor's purpose, such as grounds maintenance or equipment repair. This is not the practice, however, with OVP staff, who generally provide no information about a visitor's purpose in coming to the Residence, or with whom the visitor is scheduled to meet. They do not indicate whether visitors have appointments with the Vice President or his staff to discuss official business, are friends or family members arriving for a personal visit, or are service workers scheduled to perform maintenance or repairs on the Residence. Therefore, OVP requests for visitor access to the Residence generally provide the Secret Service with no information from which it could tell why particular appointments were made, or determine the affiliations of visiting persons with the Vice President, his family, his staff, or any outside organizations. As a result, in order to determine which FOIA exemptions apply to these records, the Secret Service would have to refer the records to the OVP. In addition to referral to the OVP, it is my understanding that e-mails and other access requests from the military may potentially need to be referred to the originating agency for FOIA processing.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct to the best of my knowledge and belief.

10/25/06
Date

Paul S. Morrissey
Deputy Assistant Director
Office of Protective Operations
United States Secret Service

# EXHIBIT 1

# MEMORANDUM OF UNDERSTANDING
## Between the White House Office of Records Management and the United States Secret Service Records Management Program Governing Records Generated By the White House Access Control System

### INTRODUCTION

1. This MEMORANDUM OF UNDERSTANDING between the White House Office of Records Management ("White House") and the United States Secret Service Records Management Program ("the Secret Service") (collectively, "The Parties") memorializes and confirms the agreement governing the status and handling of records generated through the White House Access Control System.

### DEFINITIONS

2. The White House Access Control System ("WHACS") includes two interrelated systems used by the Secret Service for controlling and monitoring access to the White House Complex:

    a. The Worker and Visitor Entrance System ("WAVES");

    b. The Access Control Records System ("ACR").

3. "WHACS Records" include "WAVES Records" and "ACR Records."

4. "WAVES Records" consist of records generated when an authorized White House pass holder submits to the Secret Service information about visitors (and workers) whose business requires their presence at the White House Complex.

    a. WAVES Records include the following information submitted by the pass holder: the visitor's name; the visitor's date of birth; the visitor's Social Security Number; the time and location of the planned visit; the name of the pass holder submitting the request; the date of the request.

    b. Once a visit takes place, WAVES Records are typically updated electronically with information showing the actual time and place of the visitor's entry into and exit from the White House Complex.

5. "ACR Records" consist of records generated when a White House pass holder, worker, or visitor swipes his or her permanent or temporary pass over one of the electronic pass readers located at entrances to and exits from the White House Complex.

    a.    ACR Records include the following information: the pass holder's name and badge number; the time and date of the swipe; and the post at which the swipe was recorded.

6. "Federal Records" mean documentary materials subject to the Federal Records Act (44 U.S.C. § 3301 et seq.).

7. "Presidential Records" mean documentary materials subject to the Presidential Records Act (44 U.S.C. § 2201 et seq.).

8. "The White House Complex" means the White House and the Eisenhower Executive Office Building, and the secured grounds encompassing them, and the New Executive Office Building.

9. The "White House Office of Records Management" ("WHORM") means the office in the White House responsible for preserving Presidential Records.

## BACKGROUND

10. WHACS is operated by the Secret Service in order to control and monitor the entry and exit of persons into and out of the White House Complex.

11. The information contained in WHACS Records originates with White House pass holders, visitors, and workers as a result of White House business.

    a.    Such information reflects the conduct of the President's business by providing details about the comings and goings of staff, workers, and visitors to the White House.

12. The authorized White House pass holders provide information contained in WAVES Records to the Secret Service temporarily for two limited purposes:

    a.    To allow the Secret Service to perform background checks to determine whether, and under what conditions, to authorize the visitor's temporary admittance to the White House Complex;

    b.    To allow the Secret Service to verify the visitor's admissibility at the time of the visit.

13. Once the visit ends, the information contained in WAVES Records and ACR Records has no continuing usefulness to the Secret Service.

14. It has been the longstanding practice of the Secret Service to transfer WAVES Records on CD-ROM to WHORM every 30 to 60 days. Except as noted in paragraph 16 below, once the Secret Service transferred the WAVES Records, the Secret Service ensured that those records were erased from its computer system.

  a. Under this practice, the Secret Service has retained WAVES Records for completed visits for only a brief period, and solely for the purpose of facilitating an orderly and efficient transfer of those records to WHORM.

15. The Secret Service historically has retained ACR Records in its computer system without transferring those records to WHORM. In 2004, however, the Secret Service and the White House recognized and agreed that ACR Records should be treated in a manner consistent with the treatment of WAVES Records, and concluded that ACR Records should be transferred to WHORM and eliminated from the Secret Service's files. The Secret Service has continued to maintain ACR Records pending a legal determination of their status as Presidential Records.

16. In October 2004, at the request of the National Archives and Records Administration ("NARA"), the Secret Service began retaining its own copy of the WAVES Records that it transferred to the White House.

  a. The Secret Service agreed to NARA's request on the understanding that it would be a temporary practice maintained until a legal determination was made confirming the propriety of handling WHACS Records as Presidential Records.

## UNDERSTANDING AND AGREEMENT

17. The purpose of this Memorandum of Understanding is to express and embody The Parties' understanding and agreement that WHACS Records whenever created:

  a. are at all times Presidential Records;

  b. are not Federal Records; and

  c. are not the records of an "agency" subject to the Freedom of Information Act (5 U.S.C. § 552).

18. The Parties understand and agree that all WHACS Records are at all times under the exclusive legal custody and control of the White House.

  a. Although the Secret Service may at times have physical possession of WHACS Records, such temporary physical possession does not alter the legal status of those records, and does not operate in any way to divest the White House of complete and exclusive legal control.

19. The Parties understand and agree that any information provided to the Secret Service for the creation, or in the form, of WHACS Records is provided under an express reservation of White House control.

20. The Parties understand and agree that the White House, but not the Secret Service, has a continuing interest in WHACS Records and that the White House continues to use the information contained in such records for various purposes. Specifically:

    a. WAVES Records have historical and other informational value to the White House as evidence of who has been invited and/or granted admission to the White House to meet with the President or members of his staff.

    b. ACR Records have historical or other informational value to the White House, as evidence of the comings and goings of staff, visitors, and workers at the White House Complex in the conduct of White House business.

21. The Parties understand and agree that, once a visitor's visit to the White House Complex is complete, the Secret Service has no continuing interest in preserving or retaining WAVES Records. The Parties also understand and agree that the Secret Service has no interest whatsoever in preserving or retaining ACR Records.

    a. WHACS Records are therefore not appropriate for preservation by the Secret Service either as evidence of the Secret Service's activities or for their informational value.

22. The Secret Service understands and agrees that it will regularly transfer all WHACS Records in its possession to WHORM, and that it will not retain its own copies of any WHACS Records except as is necessary to facilitate the transfer of those records to WHORM.

    a. Any temporary retention of WHACS Records by the Secret Service after the visit, entrance, or exit memorialized by those records is solely for the purpose of facilitating an orderly and efficient transfer of those records, and does not operate in any way to divest the White House of complete and exclusive legal control.

23. The understandings and agreements expressed herein apply to:

    a. Any and all WHACS Records currently in the possession or custody of the Secret Service;

    b. Any and all WHACS Records that may be generated at any time subsequent to the execution of this Memorandum of Understanding.

24. It is specifically intended by The Parties that the understandings and agreements set forth herein serve as evidence that the White House at all times asserts, and the Secret Service disclaims, all legal control over any and all WHACS Records subject to this Memorandum of Understanding.

a. The foregoing is not intended, and should not be construed, to suggest that WHACS Records in the possession or custody of the Secret Service before the execution of this Memorandum of Understanding were under the legal control of the Secret Service.

_____  
Director, White House Office  
of Records Management

_____  
Chief Records Officer,  
United States Secret Service

Dated: 5-17, 2006